An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-51

Filed 21 January 2026

Surry County, Nos. 22JA000148-850, 22JA000149-850

IN THE MATTER OF: D.B., J.M.

Appeal by Respondent-Mother from orders entered 30 August 2023 by Judge Gretchen H. Kirkman in Surry County District Court. Heard in the Court of Appeals 5 November 2024.

> *The Law Office of Partin & Cheek, P.L.L.C., by R. Blake Cheek, for Petitioner-Appellee Surry County Department of Social Services.*
>
> *Mercedes O. Chut, for Respondent-Appellant-Mother.*
>
> *James N. Freeman, Jr., for the Guardian ad Litem.*

CARPENTER, Judge.

Respondent-Mother appeals from the trial court's 30 August 2023 permanency-planning orders (the "Permanency-Planning Orders") granting custody of D.B. ("Donna") and J.M. ("John") (collectively, the "Juveniles")[1] to their respective biological fathers and ceasing reunification efforts with Respondent-Mother. On

---

[1] Pseudonyms are used to protect the identities of the Juveniles and for ease of reading. *See* N.C. R. App. P. 42(b).

appeal, Respondent-Mother argues the trial court lacked subject-matter jurisdiction, or in the alternative, the authority, to enter the 24 February 2023 nonsecure custody orders (the "Nonsecure Custody Orders") and consequently erred by basing future orders, including the Permanency-Planning Orders, on the oral allegations that led to the Nonsecure Custody Orders. Respondent-Mother further asserts that the trial court lacked authority to modify the initial disposition orders absent a proper motion and erred by ceasing reunification efforts. After careful review, we affirm the Permanency-Planning Orders.

## I. Factual & Procedural Background

This appeal concerns two of Respondent-Mother's six children: Donna, born in May 2014, and John, born in October 2011. Respondent-Mother's other children, not implicated in this appeal, are: Chris, born in 2007; Hannah, born in 2008; Andrea, born in 2010; and Caleb, born in 2020. Respondent-Mother's current husband, who she married in 2020, is the Juveniles' step-father ("Step-Father"). The Juveniles' biological fathers are not parties to this appeal.

In late 2021, the Surry County Department of Social Services ("DSS") received reports of incidents of domestic violence between Respondent-Mother and Step-Father. In February 2022, DSS determined the family needed services and Respondent-Mother and Step-Father agreed to complete a case plan requiring them to: complete a parenting program; complete a "DonLin" assessment and follow all

recommendations from the assessment; and engage in mental health treatment and follow all recommendations from the treatment.

Due to concerns regarding Respondent-Mother's mental health, DSS requested that Respondent-Mother participate in a psychological evaluation. On 9 March 2022, Carol Pully, a licensed psychological associate, performed Respondent-Mother's psychological evaluation and determined Respondent-Mother met the "diagnostic criteria" for: bipolar disorder, unspecified personality disorder; and unspecified trauma and stressor-related disorder. In her report, Pully noted that Respondent-Mother's "level of self-esteem is of concern" and recommended that Respondent-Mother participate in medication management and individual outpatient therapy.

To investigate the impact of Respondent-Mother's mental health issues on the family, DSS requested that the family participate in a Child Family Evaluation. Chris Shaeffer, a licensed psychologist, conducted the Child Family Evaluation from 21 June to 23 June 2022. Respondent-Mother's three eldest children, Chris, Hannah, and Andrea, participated in the evaluation. In his report, Dr. Shaeffer described Respondent-Mother's mental health issues as "moderate to severe" and concluded that Chris, Hannah, and Andrea, "appear to be highly impacted by, and negatively affected by, [Respondent-Mother's] behaviors stemming from her mental health issues." Further, Dr. Shaeffer determined Chris, Hannah, and Andrea each had their own "significant mental health needs . . . [that] appear to be insufficiently addressed at present."

On 20 December 2022, DSS filed juvenile petitions (the "Petitions") alleging all six children were neglected. In the Petitions, DSS alleged Respondent-Mother's mental health issues were of "great concern because of her erratic and domineering behaviors" and that the children "express[ed] concern of their home environment because of the arguments between them and [Respondent-Mother], [Respondent-Mother's] behaviors, and fear of what [Respondent-Mother] would do or say." The Petitions also alleged Respondent-Mother threatened suicide in the presence of the children, scared the children by threatening foster care, and blamed the family's problems on DSS and the children's other parents.

The Petitions further alleged Respondent-Mother "has continued to fail to make any behavioral changes that would indicate an increase in her protective capacity" and indicated the children "continue to be subjected to [Respondent-Mother's] impulsive, erratic, and inappropriate behavior." Finally, DSS noted in the Petitions that it had obtained a video recording of Respondent-Mother "screaming and cussing at one of [Donna and John's] siblings and wishing they would drown in their bath water, calling them vulgar, nasty names and belittling them." DSS did not immediately obtain nonsecure custody of the Juveniles when it filed the Petitions.

On 15 February 2023, the trial court conducted adjudication and disposition hearings. On 22 February 2023, the trial court entered an order adjudicating the Juveniles as neglected. In the adjudication order, the trial court found that Respondent-Mother "agreed to stand silent as to the allegations of the Juvenile

Petitions and waived presentation of the evidence." The trial court further found that the "allegations of the Juvenile Petitions, being uncontroverted, are facts found by this Court, and as such, [DSS] has met its burden by clear and convincing evidence . . . ." At this time, custody of the Juveniles remained with Respondent-Mother and Step-Father.

Soon after the adjudication and disposition hearing, the situation in the family home deteriorated suddenly. On or about 23 February 2023, the family arrived home in the evening to find the home in complete disarray. Chris's dog had escaped from its cage and there was "blood kind of strewn out everywhere." Chris's dog had broken into a rat cage and killed Hannah's pet rats. An argument between Respondent-Mother and Chris ensued. When Chris said something "disrespectful," Respondent-Mother challenged Step-Father to fight Chris in front of the other children. Step-Father threatened to kill Chris with a sharp gardening tool. Both parties landed blows before law enforcement arrived to intervene.

As a result of the altercation, on 24 February 2023, the trial court entered the Nonsecure Custody Orders placing Donna and John in the legal custody of DSS and granting physical custody to their respective fathers. On 28 February 2023, the trial court entered the disposition order and scheduled a review hearing.[2] After two

---

[2] The disposition orders were prepared and signed by the trial court prior to entry of the Nonsecure Custody Orders but were not filed by the clerk of court until 28 February 2023. *See* N.C. Gen. Stat. § 1A-1, Rule 58 (2023). The disposition orders provide that legal and physical custody of Donna would

hearings on the need for continued nonsecure custody in February and March 2023, the trial court continued custody of the Juveniles with DSS. The trial court scheduled a review hearing on the need for continued nonsecure custody for 20 April 2023.

Thereafter, the parties consented to combining the 20 April 2023 hearing with the ninety-day review hearing. The hearing occurred on 20 April, 18 May, 26 June, and concluded on 20 July 2023. During the hearing, John and his three eldest siblings each testified to Respondent-Mother's erratic behavior, angry outbursts, and inappropriate discipline. John and his siblings also described the ongoing conflict between the four eldest siblings and Respondent-Mother; the recurring incidents domestic violence between Respondent-Mother and Step-Father; and the incidents of domestic violence between Chris and Step-Father, spurred by Respondent-Mother's demands that Chris "beat up" Step-Father when he was violent with Respondent-Mother.

On 30 August 2023, the trial court entered the Permanency-Planning Orders, noting at the outset that the parties had "consented to waiving notice and combining the Nonsecure Hearing with the initial Permanency Planning Hearing." On 30 August 2023, the trial court entered the Permanency-Planning Orders. On 14 September 2023, Respondent-Mother filed written notice of appeal.

## II. Jurisdiction

---

remain with Respondent-Mother and legal and physical custody of John would remain with Respondent-Mother and John's father.

As a threshold matter, we consider the scope of our jurisdiction in this appeal. Respondent-Mother's first argument is that the trial court lacked subject-matter jurisdiction, or in the alternative, the authority, to enter the Nonsecure Custody Orders because the Petitions were no longer "pending" when DSS sought nonsecure custody of the Juveniles. Put differently, Respondent-Mother asserts DSS was required to file a new pleading to obtain nonsecure custody because the Petitions were resolved by entry of the adjudication and disposition orders. According to Respondent-Mother, the trial court consequently erred by basing future orders, including the Permanency-Planning Orders, on the allegations that led to the Nonsecure Custody Orders. Respondent-Mother does not dispute that properly verified petitions were filed in this case, nor does she assert that the trial court lacked subject-matter jurisdiction over the juvenile proceeding in its entirety.

"Any order, *other than nonsecure custody order*, that changes legal custody of a juvenile" may be appealed to this Court. N.C. Gen. Stat. § 7B-1001(a)(4) (2023) (emphasis added). "Nonsecure custody orders are expressly excluded from the statutory list of appealable juvenile orders . . . ." *In re A.T.*, 191 N.C. App. 372, 374, 662 S.E.2d 917, 918–19 (2008) (citing N.C. Gen. Stat. § 7B-1001 (2007)). Because "[c]hallenges to a trial court's subject-matter jurisdiction may be raised at any stage of proceedings" including for the first time on appeal, we may consider an otherwise non-appealable order to the extent it implicates the trial court's subject-matter

jurisdiction over the case. *In re K.U.-S.G.*, 208 N.C. App. 128, 131, 702 S.E.2d 103, 105 (2010).

For example, in *In re T.P.*, the mother appealed from an order terminating her parental rights, challenging the trial court's subject-matter jurisdiction. 197 N.C. App. 723, 725, 678 S.E.2d 781, 783–84 (2009). Specifically, the mother asserted the trial court's "initial temporary order for nonsecure custody . . . was improper;" thus, the trial court lacked jurisdiction "over the entire case." *Id.* at 726–27, 678 S.E.2d at 784–85. We disagreed, concluding the defect in the nonsecure custody order "did not deprive the trial court of subject matter jurisdiction to enter [the] termination order." *Id.* at 729, 678 S.E.2d at 786. Similarly, in *In re L.B.*, the mother appealed from a permanency-planning order, arguing the trial court lacked subject-matter jurisdiction to enter the order because the trial court lacked authority to enter the initial nonsecure custody order. 181 N.C. App. 174, 186, 639 S.E.2d 23, 28–29 (2007).

In *T.P.* and *L.B.*, neither mother had a statutory right to appeal the respective nonsecure custody orders. *See* N.C. Gen. Stat. § 7B-1001(a)(4); *In re T.P.*, 197 N.C. at 726–27, 678 S.E.2d at 784–85; *In re L.B.*, 181 N.C. App. at 186, 639 S.E.2d at 28–29. Nevertheless, we examined the nonsecure custody orders to determine the extent, if any, the trial court was deprived of subject-matter jurisdiction in subsequent proceedings. *In re T.P.*, 197 N.C. at 726–27, 678 S.E.2d at 784–85; *In re L.B.*, 181 N.C. App. at 186, 639 S.E.2d at 28–29.

Here, Respondent-Mother acknowledges that the trial court obtained subject-matter jurisdiction when DSS filed the Petitions and does not argue that the trial lacked jurisdiction over the proceedings. In other words, Respondent-Mother asserts the trial court had subject matter jurisdiction before and after entry the Nonsecure Orders, but not at the moment they were entered because section 7B-503(a) requires a *pending* juvenile petition to enter a nonsecure custody order. *See* N.C. Gen. Stat. § 7B-503(a) (2023) ("An order for nonsecure custody shall be made only when there is a reasonable factual basis to believe the matters alleged in the petition are true."). This argument, however, does not elevate the Nonsecure Custody Orders to appealable orders properly before this Court on their merits. *See* N.C. Gen. Stat. § 7B-1001(a)(4). Thus, we do not have jurisdiction to review Respondent-Mother's argument that the trial court lacked jurisdiction or authority to enter the Nonsecure Custody Orders. We do, however, have jurisdiction to review Respondent-Mother's remaining arguments. *See* N.C. Gen. Stat. § 7B-1001(a)(4).

## III. Issues

The issues are whether the trial court: (1) was authorized to modify the disposition order in the absence of a proper pleading; and (2) erred by ceasing reunification efforts with Respondent-Mother.

## IV. Analysis

### A. Modification

- 9 -

Respondent-Mother argues the Permanency-Planning Orders were not properly before the trial court because DSS did not file a motion for review as required by section 7B-1000. Respondent-Mother further asserts the trial court's relevant findings did not warrant modification of the disposition order. We disagree.

Respondent-Mother points to a conclusion of law that appears in both Permanency-Planning Orders to support her assertion that the trial court "believed it was modifying the disposition order." The conclusion of law states: "There has been a substantial change in circumstances affecting the welfare of the juvenile that warrants a modification of the prior order on custody of said juvenile." Although a proper motion is required to "conduct a modification hearing to determine whether the order of the court is in the best interest of the juvenile, the trial court conducted a permanency-planning hearing, not a modification hearing. *See* N.C. Gen. Stat. § 7B-1000. Indeed, the preamble of the Permanency-Planning Orders states:

> THIS MATTER coming on to be heard and being heard before the undersigned Presiding Judge FOR REVIEW pursuant to N.C.G.S. § 7B-506, and N.C.G.S. § 7B-906.1, et. seq., on 4/20/2023, and continuing in progress on 5/18/2023, 6/28/2023, and 7/20/2023. The parties consented to waiving notice and combining the Nonsecure Hearing with the initial Permanency Planning Hearing.

Within ninety days of the initial disposition hearing, the trial court "shall conduct a review or permanency planning hearing." N.C. Gen. Stat. § 7B-906.1(a) (2023). Whether the ninety-day hearing is a "review" or "permanency planning hearing" depends on the custodial status of the children involved. *Id.* "If custody *has*

*not* been removed from [the] parent . . . the hearing shall be designated as a review hearing." *Id.* (emphasis added). "If custody *has* been removed . . . the hearing shall be designated as a permanency planning hearing." *Id.* (emphasis added). At any permanency-planning hearing, the trial court may

> maintain the juvenile's placement under review or order a different placement, appoint a guardian of the person for the juvenile [N.C. Gen. Stat. §] 7B-600 or order any disposition authorized by [N.C. Gen. Stat. §] 7B-903, including the authority to place the child in the custody of either parent or any relative found by the court to be suitable and found by the court to be in the best interest of the juvenile.

N.C. Gen. Stat. § 7B-906.1(i).

Here, in the disposition order entered 28 February 2023, the trial court scheduled a ninety-day hearing for 18 May 2023. The disposition order continued custody with Respondent-Mother, so the 18 May 2023 hearing was originally calendared as a "review" hearing. *See id.* Nevertheless, the intervening Nonsecure Custody Orders, entered on 24 February 2023, removed the Juveniles from Respondent-Mother's custody. Because "custody [was] removed" from Respondent-Mother, the trial court was now obligated to conduct a permanency-planning hearing, not a review hearing. *See* N.C. Gen. Stat. § 7B-906.1(a). Accordingly, the parties consented to combining the 20 April 2023 nonsecure custody review hearing with the 18 May 2023 permanency-planning hearing.

Respondent-Mother's hyper-technical argument that the purpose of the hearing was to modify the disposition order is without merit. Respondent-Mother consented to participate in a permanency-planning hearing and by doing so necessarily acknowledged that the disposition order was not an accurate reflection of the custodial status of the Juveniles. *See Harney v. Harney*, 295 N.C. App. 456, 473, 907 S.E.2d 23, 36 (2024). Further, Respondent-Mother's reliance on the trial court's conclusion that there had been "a substantial change in circumstances . . . warrant[ing] modification of the prior order on custody" unduly elevates form over substance by seeking to redirect our focus from the "polar star" in juvenile matters— the best interests of the Juveniles. *See In re T.H.T.*, 362 N.C. 446, 450, 665 S.E.2d 54, 57 (2008). The Juveniles were not in Respondent-Mother's custody, therefore, the trial court properly conducted a permanency-planning hearing prioritizing the Juveniles' best interest. *See* N.C. Gen. Stat. § 7B-906.1(a). Thus, a motion for review of the disposition order under section 7B-1000 was not required, and the trial court had full authority to enter the Permanency-Planning Orders and grant custody to the Juveniles' fathers. Because we conclude the trial court did not conduct a modification hearing, we do not reach Respondent-Mother's argument concerning the sufficiency of the findings supporting the trial court's conclusion that there had been a substantial change of circumstances.

**B. Cessation of Reunification Efforts**

Respondent-Mother also argues the trial court erred by ceasing reunification efforts in the absence of a permanent plan for the Juveniles. Respondent-Mother further asserts that the findings supporting cessation of reunification are not supported by the evidence. We disagree.

Our review of a permanency-planning order "is limited to whether there is competent evidence in the record to support the findings and whether the findings support the conclusions of law." *In re J.H.*, 244 N.C. App. 255, 268, 780 S.E.2d 228, 238 (2015). "The trial court's dispositional choices—including the decision to eliminate reunification from the permanent plan—are reviewed for abuse of discretion." *In re A.P.W.*, 378 N.C. 405, 410, 861 S.E.2d 819, 825–26 (2021). "An abuse of discretion occurs 'in the event that a court's actions are manifestly unsupported by reason, or are so arbitrary that it could not have been the result of a reasoned decision.'" *In re D.R.F.*, 293 N.C. App. 544, 554, 901 S.E.2d 390, 398 (2024) (quoting *In re Z.T.W.*, 238 N.C. App. 365, 374, 767 S.E.2d 660, 667 (2014)).

"At any permanency planning hearing, the court shall adopt concurrent permanent plans and shall identify the primary plan and secondary plan." N.C. Gen. Stat. § 7B-906.2(b) (2023). Reunification must be a primary or secondary plan unless: (1) the court makes written findings under Chapter 7B-901(c) or 7B-906.1(d)(3); (2) the permanent plan is or has been achieved; or (3) "the court makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety." N.C. Gen. Stat. § 7B-906.2(b).

"Reunification" is defined as "[p]lacement of the juvenile in the home of *either parent* or placement of the juvenile in the home of a guardian or custodian from whose home the child was removed by court order."  N.C. Gen. Stat. § 7B-101(18c) (2023) (emphasis added).  Section 7B-906.1(d)(3) states

> [a]t each hearing, the court shall consider the following criteria and make written findings regarding those that are relevant:
>
> . . . .
>
> (3) Whether efforts to reunite the juvenile with *either parent* clearly would be unsuccessful or inconsistent with the juvenile's health or safety and need for a safe, permanent home within a reasonable period of time. The court shall consider efforts to reunite regardless of whether the juvenile resided with the parent, guardian, or custodian at the time of removal.

N.C. Gen. Stat. § 7B-906.1(d)(3) (2023) (emphasis added).

Here, Finding of Fact 3 in the Permanency-Planning Orders established the primary plan as reunification.  Though the Permanency-Planning Orders effectively ceased reunification efforts as to Respondent-Mother, they did not eliminate reunification from the permanency plan.  Rather, the trial court simultaneously achieved the primary plan of reunification by placing the Juveniles with "either parent . . ."—their biological fathers.  *See* N.C. Gen. Stat. §§ 7B-101(18c), -906.1(d)(3). The trial court's best interests determination was supported by the evidence and robust findings of fact.  Accordingly, the trial court did not abuse its discretion by achieving the primary plan of reunification.

## V. Conclusion

Beyond concluding the Nonsecure Custody Orders did not deprive the trial court of subject-matter jurisdiction over the proceedings, we lack jurisdiction to consider Respondent-Mother's argument concerning the Nonsecure Custody Orders. The trial court properly conducted a permanency-planning hearing and did not err by achieving reunification with the Juveniles' biological fathers. Accordingly, we affirm the Permanency-Planning Orders.

AFFIRMED.

Judges STROUD and ZACHARY concur.

Report per Rule 30(e).